**FOURTH DIVISION**
**DOYLE, P. J.,**
**COOMER and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**February 20, 2020**

# In the Court of Appeals of Georgia

A19A1979. SIVONDA v. THE STATE.

COOMER, Judge.

A jury found Joseph Sivonda guilty of two counts of rape, three counts of armed robbery, and two counts of aggravated sodomy. On appeal, Sivonda contends that the trial court erred when it allowed exhibits that violated the continuing witness rule to go back with the jury during deliberations. For the reasons discussed below, we affirm.

"On appeal from a criminal conviction, we view the evidence in the light most favorable to the verdict, with the defendant no longer enjoying a presumption of innocence." *Reese v. State*, 270 Ga. App. 522, 523 (607 SE2d 165) (2004). So viewed, the evidence shows that one of the three victims, N. B., advertised her

services on Backpage.com.[1] N. B. testified that men paid for her "time," but that she did have sex with men after they paid her. N. B. was contacted in response to her advertisement and asked to come to a house in Norcross. N. B. drove to the house and knocked on the door. A man answered the door and invited her in. As N. B. walked further into the house, she realized that it was abandoned. Then the man told her that because he did not have any money, he was going to rape her. He pulled out a knife and told N. B. to give him her jewelry, money, and cell phone. The man told N. B. to take off all of her clothes. He told her that if she screamed, he would kill her. He also told her that he had pepper spray that he would use on her. After N. B. took her clothes off, he took her to the bathroom and forced her to give him unprotected oral sex. He also had sexual intercourse with her, but used a condom after she begged him to do so. Afterward, he took N. B. back to the basement where her clothes were. The man allowed N. B. to leave the house, and she drove to a gas station. While she was at the gas station, a police officer approached her and asked if she was okay. She did

---

[1] In an April 2018 press release, the United States Department of Justice announced the seizure of Backpage.com, describing it as "the Internet's leading forum for prostitution ads." U. S. Dept. of Justice, Backpage's Co-Founder and CEO, As Well As Several Backpage-Related Corporate Entities, Enter Guilty Pleas (Apr. 12, 2018), https://www.justice.gov/opa/pr/backpage-s-co-founder-and-ceo-well-several-backpage-re lated-corporate-entities-enter-guilty.

not tell the police officer what had happened because of her involvement with Backpage.com.

Another victim, A. J., was a dancer at a strip club who also advertised her services on Backpage.com for "massages, private dances, and et cetera." A. J. testified that "et cetera" included sex if the person was willing to pay the price she quoted. On April 29, 2013, she received a text message in response to her advertisement on Backpage.com from someone who agreed to pay for a massage. The person who contacted her asked her to go to an apartment in Gwinnett. The apartment number was S-6.

When she arrived at the apartment, a man opened the door and invited her in. When A. J. stepped inside, she noticed that there was no furniture in the apartment, so she turned around to leave. By then, the man was standing behind her with a gun pressed against her back. The man told her to give him her phone and her purse. He told her that if she followed his instructions, she would make it out alive. A. J. testified that she feared for her life. The man made her strip naked while he held a black handgun. The man searched her, then told her to put her clothes back on. Then the man ordered her to perform oral sex on him. He held the gun by her head as she performed unprotected oral sex on him. A. J. noticed a tattoo or birthmark on his

3

lower abdomen. Afterward, the man said that he was going to go out a back door, and that he wanted her to stand in the bathroom for five minutes. The man took $50 that she had in her bra. He also took her phone and identification.

A. J. did not call the police until the next day when she told her mother what had happened, and her mother made her call the police. A. J. told the police the address and apartment number where she had gone. She was also able to tell the police part of the phone number the man had used to contact her.

The third victim, S. F., worked as an escort in addition to working part-time as a home healthcare nursing assistant. She placed advertisements on Backpage.com. Her services could be for a dinner and movie date, but it was usually "intimate," meaning that she had sexual intercourse with people in exchange for money. On April 30, 2013, someone responded to one of S. F.'s advertisements. S. F. was instructed to go to an apartment in Gwinnett County. S. F. was first told to go to apartment S-7, but then the man who had contacted her called back and told her to go to apartment S-6. When she arrived at the apartment building around 4:00 a.m., a man was standing by a flight of stairs. S. F. and the man spoke and walked toward a flight of stairs, and then the man turned around and pulled a gun on her. He had one hand on her arm and, with the other hand, pointed the black handgun at her face. The man told

S. F. to be quiet and do what he told her. He asked if she had money, and she said she did not. He made her give him her phone. The man then made her perform unprotected oral sex on him. He then got a condom out of his coat and had sexual intercourse with her. The man then made her perform unprotected oral sex on him again. She vomited on the grass. Some of the vomit got on her sweater, so the man took her sweater. S. F. convinced the man to give her phone back before he left. The man told her to wait on the steps for three minutes after he left, but she ran away as soon as he was out of sight.

S. F. ran back to her car and drove around looking for the man because she wanted to run him over with her car. She did not find the man, and she returned to the apartment complex parking lot, where she was able to flag down a police officer. S. F. told the police officer what happened. The police officer asked her if she was willing to undergo a sexual assault examination. She was willing, and drove herself to the sexual assault center. She gave a statement to a detective at the sexual assault center before the examination.

The police noticed that both A. J. and S. F. had reported that their assaults occurred at the same location, that both incidents were robberies with a sexual component, and that both women gave similar descriptions of the man who robbed

them. In addition, the phone number used to contact A. J. and S. F. had the same first six digits, although the police did not know if the last four digits were the same because A. J.'s phone had been taken from her and she could not remember the last four digits. The police obtained phone records for the phone number used to contact S. F., and those phone records led them to believe that the Sivonda brothers, Joseph and Kevin, might be involved. Based on the description of the perpetrator, the detective believed it was more likely to be Joseph Sivonda. In the call records for the number used to contact S. F., the police noticed an often-repeated phone number that they identified as belonging to Sharon Sivonda, the mother of Joseph and Kevin. Upon more investigation, the police discovered that Sharon Sivonda lived in the same apartment complex where A. J. and S. F. had been assaulted.

The police then obtained a search warrant for Ms. Sivonda's apartment. While the police were at her apartment, Ms. Sivonda allowed the police to look through her phone. She also called Joseph Sivonda while the police were there on a number that was saved on her phone as "Joe." The police obtained phone records for that number and found out that the user was listed as N. B.

When the police executed the search warrant, it was evident that both brothers lived at the apartment. In one of the bedrooms, the police found Joseph Sivonda's

social security card and a temporary Georgia driver's license. In the same room, the police found clothing that seemed to match one of the victim's description of her assailant's clothing. They also found a bag that contained a box for a cell phone and paperwork associated with a phone number. Phone records showed that this number contacted both A. J.'s and S. F.'s phones shortly before their assaults. A fingerprint analysis showed Joseph Sivonda's fingerprints on the cell phone box. An air pistol that seemed to match the description provided by the victims was found under Kevin Sivonda's dresser. The police also retrieved a key and a can of OC spray (which is also referred to as pepper spray).

The police contacted N. B. to find out why Joseph Sivonda might be using a cell phone registered to her. She said that she had been the victim of a crime and that someone had taken that phone from her. After the police talked to N. B., they secured a second search warrant for the Sivonda apartment based on the jewelry that N. B. reported had been taken from her and what the police had seen during the execution of the first search warrant. The police seized a watch and other jewelry that matched N. B.'s description of her stolen items. At trial, N. B. identified the watch seized from the apartment as her watch.

Warrants were issued for Joseph Sivonda's arrest. He was located at his girlfriend's apartment. While executing a search warrant for that apartment, the police found N. B.'s phone.

The police discovered that the key located in Sivonda's apartment opened one of the locks on the door to apartment S-6. There were two locks on the apartment door; one was a deadbolt and the other was in the doorknob itself. The key opened only the lock in the doorknob. According to the apartment manager, apartment S-6 was vacant and ready for move-in at the time of these incidents. "Ready for move-in" meant that the locks had been changed, so only the apartment management staff should have had access to that apartment. When the police contacted the apartment manager and they went to apartment S-6, it looked like the back door had been pried open.

All three victims were shown a photo lineup containing a picture of Joseph Sivonda, and all three selected his picture as the person who robbed and assaulted them. All three victims later identified Joseph Sivonda in court as their assailant. Swabs taken of S. F.'s gumline during her sexual assault examination yielded male DNA which matched a DNA sample of Joseph Sivonda.

The jury found Sivonda guilty of two counts of rape, three counts of armed robbery, and two counts of aggravated sodomy. The trial court sentenced Sivonda to serve an aggregate of three consecutive life sentences. Sivonda filed a motion for new trial. After a hearing, the trial court denied the motion for new trial. This appeal followed.

On appeal, Sivonda contends that the trial court erred by allowing exhibits that violated the continuing witness rule to go back with the jury during deliberations. We find no reversible error.

During Sivonda's trial, the State asked a police officer to write on a blank sheet of paper the phone number provided by S. F. as the number used to contact her, and then to put brackets around the first six digits. The State requested the police officer to indicate on the sheet of paper that the entire number was provided by S. F. and that the bracketed digits were provided by A. J. The State asked the same police officer to write on another sheet of paper the phone number Joseph Sivonda's mother used to contact him, and to write "the number used by defendant's mother to contact defendant . . . [a]nd how it was saved in her phone, based on what you personally observed, saved in her phone as." The State also asked a deputy with the Gwinnett County Sheriff's Department to "write the apartment number and the name of the

9

apartment and the date on which the defendant was arrested. . . . Okay. Write defendant arrested by U. S. Marshals, please."

When A. J. testified at trial, the State told her, "I want you to take this marker and in big letters write your phone number that you were using at the time out across there." When S. F. testified, the State told her, "Write your phone number that you just told us was your phone number in 2013 . . . then write your name underneath it."

At trial, the State told the nurse who performed the sexual assault examination of S. F., "And just so we can recognize it the next time we see it, I'm going to ask you to take this red pen and write in big letters on this particular . . . piece of paper that this is a rape kit collected from [S. F.] by you, and then if you'd put your initials and today's date so we can identify it as the bag that's been opened by you." The State told a detective who helped collect buccal swabs of Joseph Sivonda, "I'll get you to write something to help it make a little more sense to us the next time we see it. If you would, write known sample of defendant." After a fingerprint card was admitted into evidence, the State asked the deputy who took the fingerprints, "I'm going to ask that you write on this piece of paper known fingerprints of defendant and staple them to 52, please."

Although Sivonda did not object to the writings generated on the witness stand being admitted into evidence, he did object to the writings going back to the jury room during deliberations. The trial court overruled his objection.

"Our courts have consistently held that it is error to allow a jury to take written or recorded statements into the jury room during deliberations unless those statements are consistent with the defendant's theory of the case." *Fields v. State*, 266 Ga. 241, 243 (2) (466 SE2d 202) (1996).

> In Georgia, the continuing witness objection is based on the notion that written testimony is heard by the jury when read from the witness stand just as oral testimony is heard when given from the witness stand. But, it is unfair and places undue emphasis on written testimony for the writing to go out with the jury to be read again during deliberations, while oral testimony is received but once. The types of documents that have been held subject to the rule include affidavits, depositions, written confessions, statements, and dying declarations.

*Rainwater v. State*, 300 Ga. 800, 803 (2) (797 SE2d 889) (2017) (citation omitted).

> The continuing witness rule prohibits writings from going out with the jury when the evidentiary value of such writings depends upon the credibility of the maker. Documents that are prohibited by the continuing witness rule from going out with the jury include answers to written interrogatories, written dying declarations, and signed statements of guilt. These documents, which generally contain their makers'

11

assertions of purported truths, are ascribed evidentiary value only to the extent that their makers are credible.

*Bryant v. State*, 270 Ga. 266, 270-271 (3) (507 SE2d 451) (1998) (footnotes and punctuation omitted).

"However, harm as well as error must be shown to warrant a reversal." *Hinton v. State*, 233 Ga. App. 213, 214 (1) (504 SE2d 49) (1998) (citation and punctuation omitted). Given the overwhelming evidence of Sivonda's guilt, any alleged error in permitting the writings at issue to be sent out with the jury during their deliberations would have been harmless. All three victims testified at trial and identified Sivonda in court as their assailant. The three victims were all contacted through advertisements on the same website, using a similar means of contact. All three victims selected Sivonda's picture from a photo lineup as the person who robbed and assaulted them. Swabs taken during S. F.'s sexual assault examination yielded male DNA which matched a DNA sample of Joseph Sivonda. When police searched Sivonda's apartment, they found jewelry stolen from one of the victims, an air pistol that matched the description from two of the victims, and a key to the abandoned apartment to which Sivonda had directed two of the women. One of the victims provided the first six digits of Sivonda's cell phone number, and another victim

12

provided all ten digits of his cell phone number. The State was able to tie the phone number to Sivonda by showing that his fingerprint was on the box in which the mobile phone was sold. Phone records showed that this phone number had contacted two of the victims. When police searched the apartment where Sivonda was arrested, they found a cell phone stolen from the other victim. As the evidence of guilt in this case is overwhelming, it is highly probable that any error in allowing the writings at issue to be sent out with the jury did not contribute to the verdict. See *Gough v. State*, 236 Ga. App. 568, 570 (2) (512 SE2d 682) (1999).

*Judgment affirmed. Doyle, P. J., and Markle, J., concur*.